IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Bankruptcy No. 21-20020-CMB |
| SALEM CONSUMER SQUARE OH LLC, | Chapter 11 |
| Debtor. | |
| SALEM CONSUMER SQUARE OH LLC, | |
| Plaintiff, | Adversary No. 21-2019-CMB |
| v. | Related to Doc. No. 22 |
| BELFOR USA GROUP, INC. | |
| Defendant. | |

*Appearances*:  Michael Frank Jacobson, Esq., for Movant/Defendant, BELFOR USA Group, Inc.

Kerri Coriston Sturm, Esq., for Respondent/Plaintiff, Salem Consumer Square OH LLC

## MEMORANDUM OPINION

The matter before this Court is *BELFOR USA Group, Inc.'s Partial Motion for Summary Judgment on Debtor's Complaint to Determine Amount of BELFOR USA Group, Inc.'s Allowed Claim* ("Motion," Doc. No. 22).[1] By this Motion, BELFOR USA Group, Inc. ("BELFOR") seeks entry of an order providing that its claim is allowed in an amount of *at least* $2.8 million. The Motion is opposed by the Debtor, Salem Consumer Square OH LLC. For the reasons set forth herein, BELFOR failed to establish that, as a matter of law, Debtor waived its right to challenge

---

[1] Pursuant to 28 U.S.C. §§157 and 1334, this Court has subject matter jurisdiction. Further, this is a core matter pursuant to 28 U.S.C. §157(b)(2)(B).

or is otherwise estopped from challenging BELFOR's claim of at least $2.8 million. Accordingly, the Motion must be denied.

### Background and Procedural History

On January 5, 2021, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Since that time, the bankruptcy case has predominantly revolved around disputes with one creditor, BELFOR. On March 5, 2021, Debtor filed a *Complaint to (I) Determine Amount, Priority and Extent of Secured Status Pursuant to 11 U.S.C. §506(a) and (II) Determine Amount of BELFOR Group U.S.A. Inc's Allowed Claim* ("Complaint," Doc. No. 1). Therein, Debtor challenges BELFOR's contention that it is owed at least $2.8 million for emergency services and mitigation work on Debtor's property, a shopping center located in Dayton, Ohio (the "Property"), following a tornado in May of 2019.[2] Debtor asserts that BELFOR's invoices were inflated, challenges the quality of the work performed, and further alleges that the documents relied upon by BELFOR in support of its claim were not signed by authorized representatives of the Debtor. By filing the Complaint, Debtor seeks a determination of whether BELFOR has an allowed claim against the estate, the value of such a claim, and the secured or unsecured nature of said claim.

On May 10, 2021, BELFOR filed its Answer and Affirmative Defenses (Doc. No. 10). On June 25, 2021, this Court held a pretrial conference to address the timelines for discovery and scheduling. At that time, BELFOR advised of its imminent intention to file a dispositive motion as a "gatekeeping" motion. BELFOR asserted that such a motion could streamline or eradicate the need for discovery in the adversary proceeding. Accordingly, a deadline was set for such a motion to be filed. In addition, the Court addressed the deadlines for completion of discovery and, to the extent applicable, any motions for summary judgment following the close of discovery.

---

[2] After the Complaint was filed, BELFOR filed its Proof of Claim on May 14, 2021, asserting a secured claim in the amount of $4,339,773.18.

On July 16, 2021, BELFOR filed the instant Motion seeking a determination that BELFOR's claim is allowed in an amount not less than $2.8 million with further proceedings to determine the exact amount of the claim. The Motion was accompanied by a Brief in Support (Doc. No. 23), Concise Statement of Material Facts (Doc. No. 24), and exhibits (Doc. No. 25). Debtor filed a Brief in Opposition (Doc. No. 38), Response to Statement of Material Facts and Additional Facts (Doc. No. 39), together with its exhibits (Doc. No. 40). Thereafter, BELFOR filed its Response to Debtor's Additional Facts (Doc. No. 47), two additional exhibits (Doc. No. 49), and a Reply (Doc. No. 60) with leave of Court. Oral argument on the Motion was held on November 9, 2021.[3] The matter is ripe for decision.

Factual Background

On May 28, 2019, a tornado caused severe damage to Debtor's Property. *See* Doc. Nos. 24 and 39 at ¶¶1-2.[4] In the aftermath, the roles and authority of Robert Virginia, Thomas Osborne, and Leon Williams to act for the Debtor and/or the Debtor's then-owner, Moonbeam Capital ("Moonbeam"), are significant. *See* Doc. Nos. 24 and 39 at ¶¶3, 5, 13.[5] Following the damage to Debtor's Property, Virginia directed Debtor's insurance broker to file an insurance claim with Travelers and copied Williams and Osborne on the email with that directive. *See* Doc. Nos. 24 and 39 at ¶6. With respect to the insurance claim, Virginia and Williams were the contacts identified to the insurance adjuster, Joshua Engle; however, Virginia resigned from his position on June 10,

---

[3] BELFOR introduced an additional exhibit at oral argument; however, that exhibit is not relevant and will not be considered in disposing of the pending Motion. *See* Order entered November 12, 2021 (Doc. No. 98).

[4] The parties previously stipulated that the tornado occurred on May 27, 2019. *See* Exhibit 21 at ¶13.

[5] Osborne is employed by Debtor. *See* Exhibit D at 14:17-19. Virginia and Williams were employed by Moonbeam or its related entities (referred to herein as "Moonbeam related entities"). *See* Exhibits A and 3. By way of background and as previously observed by this Court, the roles of individuals within Moonbeam and its related entities are often overlapping. To the extent allegations are made against Moonbeam, Moonbeam is not a party to these proceedings. The relevant issue in this proceeding is the claim against the Debtor.

3

2019, less than two weeks after the insurance claim was filed. *See* Doc. Nos. 24 and 39 at ¶¶8, 27; Exhibits 2, 6, 10.

As indicated by Virginia before his resignation, BELFOR and other workers were present and working at the Property almost immediately following the tornado. *See* Doc. Nos. 24 and 39 at ¶9; Exhibit 2. Within the timeframe that BELFOR was performing work on the Property, certain documents were purportedly executed on behalf of the Debtor. Two of the documents, one labeled as Rates and Materials Schedule for Invoicing ("R&M Schedule," Exhibit 7) and the other titled Ohio Work Authorization Contract ("Work Authorization," Exhibit 8) appear to be dated May 28, 2019, at or around the commencement of BELFOR's work. These documents, however, were not signed by the same individual on behalf of Debtor.

Beginning with the R&M Schedule, BELFOR contends that the document, which details rate and invoice conditions regarding the Work Authorization, was executed by Virginia. *See* Doc. No. 24 at ¶14; Exhibit 7. Among other things, the R&M Schedule sets forth the hourly rate for numerous labor classifications, the rates for various equipment, and certain billing and payment terms. *See* Exhibit 7. Included is a provision requiring that invoices be paid or disputed within 30 days and providing for interest charges related thereto in the event timely payment is not made. *See* Doc. Nos. 24 and 39 at ¶15. Not only does Debtor contest Virginia's authority to sign agreements on its behalf, Debtor also asserts that discovery is required to determine whether Virginia actually executed the document in the first place. *See* Doc. No. 39 at ¶¶13 and 14; Exhibits A and F.

As to the three remaining documents, BELFOR asserts those were executed by Osborne on behalf of Debtor. *See* Doc. No. 24 at ¶¶13, 16, 17, 18, 25, 29; Exhibits 8, 9, 11. The first of the three documents is the Work Authorization dated May 28, 2019. *See* Exhibit 8. BELFOR relies

upon a number of provisions in the Work Authorization, including the assignment to BELFOR of any interest in insurance proceeds for BELFOR's work, authorization for the insurance carrier to name BELFOR as the sole payee on insurance checks, requirement that Debtor endorse to BELFOR any checks from the insurance carrier for its work, and agreement that the work and its price be negotiated between BELFOR and the insurance company on behalf of Debtor. *See* Doc. No. 24 at ¶19; Exhibit 8. The Work Authorization also provides that BELFOR is entitled to recover the costs and expenses of collection and interest if payment is not made. *See* Doc. No. 24 at ¶21; Exhibit 8. The second document titled Direct Pay Authorization was signed by Osborne on June 7, 2019. *See* Exhibit 9. BELFOR cites to this document in support of its contention that Debtor agreed that its insurer would pay BELFOR directly all amounts owed and further agreed to assign and transfer to BELFOR all insurance benefits and drafts payable for the services rendered. *See* Doc. No. 24 at ¶¶25-26. The final document at issue is the Certificate of Satisfaction, which provides: "I/we the undersigned hereby acknowledge the repair and/or restoration work performed by BELFOR USA Group, Inc. has been completed to my/our satisfaction." *See* Exhibit 11. BELFOR asserts the document was executed on July 2, 2019. *See* Doc. No. 24 at ¶29. In addition to other challenges related to the enforceability of these documents,[6] Debtor asserts that Osborne, the "maintenance man" for the Property, did not have the authority to bind Debtor. *See* Doc. No. 39 at ¶¶13, 16, 17, 18, 25, 29; Exhibit D, 14:22-25, 18:7-12.

Notably, the only evidence cited by BELFOR in support of Osborne's authority to bind Debtor appears to be an internal document created by BELFOR. *See* Doc. No. 24 at ¶16; Exhibit 1. This Lead Sheet indicates that Virginia contacted BELFOR and identified Osborne as both the

---

[6] Debtor also contends that the documents suffer from other inadequacies rendering them unenforceable. For instance, Debtor asserts the Work Authorization is incomplete and lacks information regarding the work to be performed. Debtor also contends that the Direct Pay Authorization does not constitute a contract, and Osborne's signature was procured under false pretenses. *See* Doc. No. 39 at ¶13.

5

site contact and primary decision maker. *See* Doc. No. 24 at ¶5; Exhibit 1. In the Declaration submitted pursuant to Fed.R.Civ.P. 56(d), Debtor asserts that information is unavailable without further discovery. *See* Exhibit F. In particular, Debtor seeks the testimony of the BELFOR employee who generated the Lead Sheet as well as the testimony of Virginia. *See* Exhibit F. The Court agrees that additional discovery is appropriate as to this document.[7]

Regardless of whether Virginia and Osborne had the authority to execute documents and bind Debtor, BELFOR asserts that Williams visited the Property on June 12, 2019, and "discussed, reaffirmed, ratified, and assented to the scope, pricing, and other terms of BELFOR's work, including the requirement of direct payment to BELFOR of insurance proceeds." *See* Doc. No. 24 at ¶28; Exhibit 6. Notably, the exhibit cited fails to support this allegation entirely. At most, the exhibit supports Williams' intention to visit the Property on June 12 and 13, 2019, to meet with Travelers' engineer, Madsen, Kneppers & Associates, Inc. ("MKA"), without any mention of BELFOR at all. Further, Debtor asserts that the alleged contract was not provided to Debtor until two months after BELFOR's services ceased. *See* Doc. No. 39 at ¶28; Exhibit G. BELFOR cites to no evidence of Williams or anyone else on behalf of Debtor and/or Moonbeam discussing, ratifying, and reaffirming the terms of the documents.[8]

---

[7] *See In re Avandia Marketing, Sales and Products Liability Litigation*, 945 F.3d 749, 761 (3d Cir. 2019)(stating that a court is obligated to provide the party opposing summary judgment with an adequate opportunity for discovery). Rather than deferring the Motion, the Court determined that permitting discovery related to the Motion would only confuse the record with further supplementations and briefing, especially so early in the discovery process. Instead, BELFOR is held to its contention that such a "gatekeeping" motion is appropriate at this early stage with denial to result if the record is not sufficiently developed. The Court cautioned that, to the extent the Motion is premature, BELFOR should promptly withdraw the Motion with the opportunity to seek summary judgment, if appropriate, after the conclusion of discovery. *See* Order entered September 10, 2021 (Doc. No. 71). Instead, BELFOR chose to proceed to oral argument.

[8] Although not contained within the Concise Statement of Material Facts, BELFOR asserts in its brief that "[a]n agent of Moonbeam Capital…, Virginia, visited the Property on May 31, 2019, and was provided with a copy of the executed Work Authorization, which he did not challenge." *See* Doc. No. 23 at ¶79. There is no citation to any exhibit to support this statement. In resolving a motion for summary judgment, it is troubling when a party's citation to an exhibit fails to provide any support for the statement

Regardless of whether Debtor is bound by the documents, BELFOR asserts Debtor nonetheless *agreed* that BELFOR would be paid $2.8 million for its work following the review by Travelers, MKA, Debtor, and Debtor's consultant. *See* Doc. No. 24 at ¶¶31,44, 45. To the extent BELFOR asserts that Debtor's consultant reviewed and audited BELFOR's billings, that fact is disputed. *See* Exhibit K. Nonetheless, Travelers did make payment related to BELFOR's work. On October 7, 2019, Travelers sent a check to Moonbeam and Debtor in the amount of $2,418,981.08 with a notation of "BELFOR EMS – UNDISPUTED COSTS." *See* Doc. Nos. 24 and 39 at ¶41. On January 15, 2020, Travelers sent another check to Moonbeam and Debtor in the amount of $381,018.92. *See* Doc. Nos. 24 and 39 at ¶43. To support the existence of an agreement regarding the amount owed, BELFOR points to a letter dated January 15, 2020, from Engle directed to Williams at Moonbeam. Therein, Engle states, "We have issued additional payment in the amount of $381,018.92. This payment reflects the balance owed for the EMS/Demolition work completed by Belfor, based on the final agreed amount of $2,800,000." *See* Exhibit 17. Notably, it cannot be determined from the correspondence *who* agreed upon the amount. Whether Engle is representing the agreement of Travelers, MKA, and BELFOR or the agreement of the Debtor and Moonbeam as well, there is no indication that Williams responded in acknowledgement of an agreement on behalf of Debtor and/or Moonbeam. Similarly, Engle's email to Williams on January 15, 2020, does not indicate an agreement by Debtor or Moonbeam. *See* Doc. No. 24 at ¶47; Exhibit 18. Further, Debtor produced the Declaration of Leon Williams, in which Williams states that neither Debtor nor Moonbeam agreed to pay BELFOR the amount of $2.8 million. *See* Exhibit A. There is no evidence of an express agreement by Debtor to pay $2.8 million to BELFOR.

---

of alleged fact and equally troubling when an alleged fact is stated without any attempt to identify support in the record.

BELFOR nonetheless contends that Travelers, as the insurance carrier, fully and finally resolved the claim pursuant to the terms of its policy. *See* Doc. No. 47 at 1-2 and ¶58; Exhibit 22. Specifically, BELFOR cites to the following provision of the policy:

> The Company will pay for covered loss or damage within 30 days after the Company receives the sworn proof of loss it requires, if:
> (1) The Insured has complied with all of the terms of this policy; and
> (2) The Company has reached agreement with the Insured on the amount of loss or an appraisal award has been made.

*See* Exhibit 22 at B(4)(g). BELFOR's conclusion from this provision seems to be that an agreement was reached between Debtor and Travelers as to the amount owed to BELFOR, since payment was made, accepted, and Debtor and/or Moonbeam agreed to the closing of the claim with Travelers. *See* Exhibit 23. Although payment was made under the policy from Travelers and Travelers indicated its intention to fully resolve the issue with BELFOR for the benefit of its insured, BELFOR was directed to deal with the Debtor and/or Moonbeam directly to resolve the issue of payment. *See* Doc. No. 39 at ¶31; Exhibit J.[9] Further, citing to other provisions within the policy, Debtor contends that Travelers did not undertake an investigation for the benefit of Debtor nor did it make a determination of liability. *See* Doc. No. 39 at ¶31; Exhibit I. Accordingly, the terms of the insurance policy do not undisputedly represent an agreement by Debtor to pay a certain amount to BELFOR.

---

[9] As noted by Engle in November 2019 regarding BELFOR's request for payment, Williams indicated, based on his experience with ownership, that the vendor would not be paid until an amount was agreed upon and out-of-pocket costs were known. *See* Exhibit J. In response, Engle relayed to Williams "that the goal between [Travelers] and Belfor was to reach an agreed cost with no out of pocket costs to the insured" and further advised that "Belfor stated they were only looking for the undisputed monies at this point." *See id.* Williams expressed that he did not want Travelers to issue funds with BELFOR's name on the check. *Id.* As a result, Engle advised BELFOR that BELFOR would not be included on payments and this would need to be worked out between BELFOR and the insured. *Id.* Notably, BELFOR seems to acknowledge Moonbeam and Debtor's continued refusal to permit Travelers to remit payment directly to BELFOR in January 2020, as BELFOR understood that Travelers would be releasing funds to Moonbeam. *See* Exhibit 18.

Although BELFOR filed an Affidavit of Mechanic's Lien in September 2019 in the amount of $3,969,438.04, BELFOR recorded a Partial Mechanic's Lien Release on January 29, 2020, reducing the amount to $2.8 million plus interest, fees, and costs. *See* Doc. Nos. 24 and 39 at ¶¶32, 49. The parties dispute the reason for the reduction. *See* Doc. Nos. 24 and 39 at ¶49. While BELFOR contends that the reduction was a result of the agreed-upon amount by the parties, Debtor contends that the reduction was related to miscalculation by BELFOR. *See* Doc. Nos. 24 and 39 at ¶49; Exhibit E, 108:12-109:15. Notably, BELFOR's citation to stipulated facts is insufficient support for the fact alleged. *See* Doc. No. 24 at ¶49. The stipulated fact cited supports the conclusion that the lien was reduced to $2.8 million; however, it does not support the alleged cause for the reduction, i.e., any agreement by the parties. *See* Exhibit 21 at ¶22. BELFOR failed to establish that the reason for the reduction is undisputed.

However, it is undisputed that BELFOR did not receive any of the insurance proceeds. *See* Doc. Nos. 24 and 39 at ¶46. On February 26, 2020, BELFOR sued Debtor, Moonbeam, and others in the Court of Common Pleas in Montgomery County, Ohio ("State Court Action"). *See* Doc. Nos. 24 and 39 at ¶50. In the First Amended Answer filed in the State Court Action, the Debtor and Moonbeam asserted affirmative defenses, including setoff. *See* Doc. No. 39 at ¶130; Exhibit AA at ¶28. In addition, Debtor and Moonbeam alleged dissatisfaction with unnecessary work performed by BELFOR and issues with BELOR's work, including inappropriate destruction. *See* Exhibit AA at ¶10. In the midst of discovery in the State Court Action, this bankruptcy case was filed.

In this proceeding and in response to BELFOR's Motion, Debtor challenges the quality of BELFOR's work, alleges improper charges, and seeks discovery with respect thereto. *See* Doc. No. 39 at ¶¶58-130; Exhibit F at ¶¶7-13; Exhibit K at ¶¶8-13. Significantly, Debtor alleges that

Debtor, Moonbeam, and Travelers were unaware of the underlying information and documentation supporting Debtor's allegations of misrepresentations and improper charges. *See* Doc. No. 39 at ¶¶66, 69, 96, 103, 104. Rather than disputing the majority of Debtor's numerous factual allegations, BELFOR simply asserts the allegations are immaterial to the pending Motion. *See* Doc. No. 47. Essentially, BELFOR seems to contend that, *even if* the allegations regarding misrepresentations and overcharges are true, Debtor is precluded from challenging that BELFOR is owed at least $2.8 million. It is on this record of largely disputed facts that BELFOR seeks partial summary judgment in its favor.

<u>Summary Judgment Standard</u>

Pursuant to Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is considered "material" if a dispute over the fact could affect the outcome under applicable law. *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, a "genuine" dispute over a material fact arises if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying any materials demonstrating the absence of a genuine dispute of material fact. *See Santini*, 795 F.3d at 416 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets this burden, the burden shifts, and the opposing party may not rest on mere allegations but rather must identify specific facts to demonstrate a genuine issue for trial. *See Santini*, 795 F.3d at 416 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986)); *Anderson*, 477 U.S. at 249. In deciding a motion for summary

judgment, the court is not to weigh the evidence or make credibility determinations, and all justifiable inferences are to be drawn in favor of the non-moving party. *See Santini*, 795 F.3d at 416; *Anderson*, 477 U.S. at 255. With this standard in mind, the Court considers BELFOR's Motion.

<u>Analysis</u>

According to BELFOR, Debtor waived its right to contest that BELFOR is owed at least $2.8 million and is estopped from further contesting that amount. Whereas waiver involves a voluntary and intentional relinquishment of a known right, estoppel precludes a party from asserting certain facts where, by the party's own conduct, he has induced another to change position in good faith reliance. *See Bradley v. Islamic Center of Peace, Inc.*, No. 29134, 2021 WL 4930319, at *3, 2021 Ohio App. LEXIS 3662, at *7 (Ohio Ct. App. Oct. 22, 2021). The Court addresses each of BELFOR's arguments in turn.

BELFOR asserts that, pursuant to the Work Authorization and Direct Pay Authorization, Debtor waived any right it had under the insurance policy with Travelers to payment for the work BELFOR performed. Further, under the Work Authorization, BELFOR contends that Travelers could negotiate the price and act as agent for Debtor and Moonbeam in such negotiations. To the extent Debtor seeks to challenge the performance and quality of BELFOR's work, BELFOR cites to the Certificate of Satisfaction to assert any such claims have been waived. However, whether Debtor is bound by any of the documents depends on whether Osborne could bind the Debtor by executing these documents.

BELFOR cites to *Ammerman v. Avis Rent A Car System, Inc.* 455 N.E.2d 1041 (Ohio Ct. App. 1982), and *Republic Waste Servs. of Ohio Hauling, LLC v. Pepper Pike Props., Inc.*, No. 81525, 2003 WL 1361134, 2003 Ohio App. LEXIS 1281 (Ohio Ct. App. Mar. 20, 2003), in support

11

of its argument that Osborne had authority, either actual or apparent, to bind Debtor. As addressed in *Republic Waste*, "[a]ctual authority may be expressed or implied." *See* 2003 WL 1361134, at *3, 2003 Ohio App. LEXIS 1281, at *6. Whereas express authority is directly granted by the principal on an agent or employee in direct terms, implied authority is that "which is incidental and necessary for the agent to carry into effect the powers expressly conferred upon him by the principal." *See* 2003 WL 1361134, at *3, 2003 Ohio App. LEXIS 1281, at *6-7. Even where there is no actual authority conferred, a principal may nonetheless be held liable for the acts of the agent "if the principal has by his words or conduct caused the third party to reasonably believe that the agent had the requisite authority to bind the principal." *See* 2003 WL 1361134, at *3, 2003 Ohio App. LEXIS 1281, at *7. BELFOR's allegations appear to relate to both forms of agency. *See* Doc. No. 24 at ¶¶16 and 17 (alleging actual authority); Doc. No. 23, at ¶69 (asserting factors in support of apparent authority).

The Lead Sheet is the primary evidence cited by BELFOR in support of Osborne's authority to bind Debtor. The Lead Sheet identifies Osborne as "Primary Decision Maker." Notably, inconsistent with BELFOR's assertion, the Lead Sheet *does not* demonstrate any authorization provided by *Williams*. *See* Doc. No. 24 at ¶16; Exhibit 1. However, most significantly, the Court agrees that Debtor should have the opportunity for discovery regarding the document generated by BELFOR. Therefore, the Lead Sheet will not be considered for the purpose of resolving the Motion.

As to actual authority of Osborne to bind Debtor, BELFOR points to no evidence of direct authority; nor does BELFOR identify evidence showing that execution of the documents on behalf of Debtor was incidental to his other maintenance duties as the court found in *Republic Waste* with respect to the maintenance supervisor's authority to sign a service agreement. *See* 2003 WL

1361134, at *3, 2003 Ohio App. LEXIS 1281, at *8-9 (where the head of the maintenance staff was authorized to sign invoices and other agreements for the purchase of supplies, tools, or materials). Accordingly, BELFOR, as the party moving for summary judgment, failed to meet its initial burden of identifying materials demonstrating the absence of a genuine dispute of material fact as to Osborne's actual authority.

As to the apparent authority of Osborne, BELFOR asserts that it reasonably relied upon representations that Osborne had the authority to bind the Debtor and Moonbeam. BELFOR contends that Osborne, the only employee of Debtor, "was listed as 'Property Manager' of the Property and a member of Moonbeam Capital's Management Team." *See* Doc. No. 23 at ¶69. There is no citation to the record to support this allegation.[10] BELFOR also states that "[h]e was the person who called BELFOR to obtain its service…." *See id.* There is no citation to the record to support this allegation, and this allegation appears inconsistent with BELFOR's own assertion contained in its Concise Statement of Material Facts. *See* Doc. No. 24 at ¶5 (asserting Virginia contacted BELFOR about emergency services and mitigation work). Further, BELFOR asserts that "Virginia, Williams, and others were provided copies of the documents and never challenged the ability of Osborne to execute them." *See* Doc. No. 23 at ¶69. However, the citations to the Concise Statement of Material Facts and exhibits cited therein do not support this statement, and Debtor contends that alleged contract was not provided to Debtor until approximately two months after BELFOR ceased work at the Property. *See* Doc. No. 39 at ¶28; Exhibit G.[11] Ultimately, to make a determination of apparent authority, the Court will have to assess the nature of Osborne's

---

[10] The Court notes, in reviewing the exhibits, that Engle identified Osborne as "Moonbeam Facility Manager" in his notes. *See* Exhibit 5. This may be relevant to a determination of the position in which Osborne was held out to the public. However, BELFOR did not include such a statement and citation within its Concise Statement of Material Facts for Debtor to respond.

[11] *See also* Exhibit J (indicating Williams' position that Osborne's signature was inadequate).

responsibilities, the position in which Debtor held him out to the public, and whether the documents in question involve responsibilities closely related to his assigned duties. *See Ammerman*, 455 N.E.2d at 1045. BELFOR failed to identify evidence in support of Osborne's apparent authority to support its Motion.[12]

In arguing that waiver nonetheless applies, BELFOR cites to *State ex rel. Noble v. Ellas*, No. CA-3507, 1990 WL 97605, 1990 Ohio App. LEXIS 2868 (Ohio Ct. App. July 9, 1990). Notably, that case provides that "[t]he party asserting waiver must prove a 'clear, unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amount to an estoppel on his part.'" *See Noble*, 1990 WL 97605, at *3, 1990 Ohio App. LEXIS 2868, at *7 (quoting *White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 505 (Ohio 1936)). In *Noble*, the appellant asserted that the appellee waived his right to claim additional compensation as he accepted, cashed, and spent the checks paying him a lesser amount. The court disagreed as the appellee voted against a resolution to limit pay and, most significantly, continued to submit time sheets claiming more than the amount available under the resolution. Such acts did not indicate waiver.

BELFOR repeatedly argues that Debtor agreed to the payment of $2.8 million to BELFOR thereby waiving any challenge with respect thereto. There is no express agreement identified by BELFOR. With respect to any characterization of the amount owed to BELFOR as "undisputed," the evidence offered in support consists of Travelers' statements. As to conduct of Debtor demonstrating a knowing and voluntary waiver of its right to contest the amount owed to

---

[12] This result is unsurprising as BELFOR conceded that there may be a genuine dispute regarding whether Debtor's representatives had authority to enter into agreements between Debtor and BELFOR. *See* Doc. No. 23 at 2 n.1.

BELFOR, as in *Noble*, the mere acceptance of funds does not necessarily establish waiver.[13] To the contrary, Debtor produced the Declaration of Leon Williams, in which Williams states that neither Debtor nor Moonbeam agreed to pay BELFOR the amount of $2.8 million. *See* Exhibit A. Notably, Williams' statement is supported by the conduct of Debtor and Moonbeam. The refusal to permit Travelers to issue payments directly to BELFOR belies the conclusion that Debtor and Moonbeam agreed to pay any amount approved by Travelers. Though Travelers' goal may have been "to reach an agreed cost with no out of pocket costs to the insured," BELFOR was directed to deal with the Debtor and/or Moonbeam directly when BELFOR sought payment of the "undisputed amount." *See* Exhibit J.[14] At this stage, the Court does not weigh the evidence. All justifiable inferences are to be drawn in favor of the Debtor as the non-moving party, and the mere acceptance of funds from Travelers fails to establish as a matter of law that Debtor waived the right to contest the amount owed to BELFOR. Further, Debtor asserts it could not have waived its challenge to the charges it believes to be inflated as it lacked the information at the time of any alleged waiver. *See* Doc. No. 39 at ¶123; Exhibit A.[15]

BELFOR also contends that Debtor's failure to challenge the quality and performance of BELFOR's work in the form of a counterclaim in the State Court Action is an omission which supports a finding of waiver. Upon review of the First Amended Answer filed in the State Court

---

[13] Further, the funds were accepted *from Travelers*, and it is not clear how that act standing alone would communicate a waiver *to BELFOR*. BELFOR has suggested that, to the extent Debtor disagrees with the amount paid by Travelers in relation to BELFOR's work, then any funds exceeding that amount should be returned to Travelers. This line of reasoning appears to suggest more about what Moonbeam's act of accepting the funds may have implied to *Travelers*. Further, Travelers is not a party to this action and what rights it may have in any potential overpayment are not presently before this Court.

[14] On October 7, 2019, Travelers sent a check to Moonbeam and Debtor in the amount of $2,418,981.08 with a notation of "BELFOR EMS – UNDISPUTED COSTS." *See* Doc. Nos. 24 and 39 at ¶41. Approximately one month after that payment, Engle's notes indicate that BELFOR was advised it would have to work out payment with the insured. *See* Exhibit J.

[15] Debtor asserts the need for further discovery on this issue. *See* Exhibit F at ¶¶7-13.

Action, it cannot be interpreted as establishing that Debtor knowingly and voluntarily relinquished its rights. *See* Exhibit AA. In fact, the First Amended Answer clearly challenges the quality of the work under the heading "First Defense." *See* Exhibit AA at ¶10. Further, to the extent BELFOR argues that Debtor can present no evidence of any damage caused by BELFOR, Debtor has specifically set forth challenges regarding demolition performed by BELFOR in the form of the Declaration of Pete Hanewich, an individual with experience in the restoration industry. *See* Exhibit K at ¶¶10-13. Accordingly, BELFOR failed to identify undisputed facts to establish waiver on this issue as well.

BELFOR's final argument is that Debtor is estopped from asserting that the value of BELFOR's services is less than $2.8 million and challenging the performance of BELFOR's work.[16] Essentially, the rule behind estoppel "is that one party will not be permitted to deny that which, by his words, his acts, or his silence (when there was an obligation to speak), he has induced a second party reasonably and in good faith to assume and rely upon to that party's prejudice or pecuniary disadvantage." *See First Fed. Sav. & Loan Ass'n. v. Perry's Landing, Inc.*, 463 N.E.2d 636, 647 (Ohio Ct. App. 1983). BELFOR cites to the following elements for estoppel to apply: "(1) a representation by the party to be estopped; (2) that communicates a fact or state of affairs in a misleading way; (3) and induces reasonable, actual reliance by the second party; and (4) the party seeking estoppel would be prejudiced unless the other party is prevented from asserting a right in contradiction with the earlier representation." *See* Doc. No. 23 at ¶70 (citing *Cont'l Cas. Co. v. Fifth/Third Bank*, 418 F.Supp.2d 964, 972 (N.D. Ohio 2006)).

---

[16] BELFOR also contends that Debtor is estopped from challenging the authority of its agents who executed the agreements and documents related to this claim. *See* Doc. No. 23 at ¶¶77-80. The argument relies on the *Ammerman* and *Republic Waste* cases and appears to be a restatement of the argument already addressed by the Court regarding authority of an agent. Apparent authority or agency by estoppel are equivalent terms and based upon the same elements. *See Ammerman*, 455 N.E.2d at 1045.

16

As to the value of the services, BELFOR asserts that Debtor represented that BELFOR would be paid directly by Travelers through the Work Authorization and Direct Pay Authorization "as well as…numerous communications with the employees and agents of Debtor and Moonbeam Capital." *See* Doc. No. 23 at ¶71. First, to the extent BELFOR relies on the documents executed by Osborne to bind the Debtor, as discussed *supra*, Osborne's authority to execute the documents has not been determined. Second, there is no citation to support the alleged "numerous communications" making this representation to BELFOR. Nonetheless, BELFOR asserts that "[a]s part of the audit process and after, Debtor repeatedly represented, *both affirmatively and by omission,* that it had agreed on the $2.8 million payment to BELFOR." *See* Doc. No. 23 at ¶ 74 (emphasis added). BELFOR fails to cite any *affirmative* representations by Debtor.

With respect to alleged *omissions* indicating to BELFOR that Debtor would not dispute payment in the amount of $2.8 million, BELFOR's general allegation regarding omissions during the audit process is insufficient. While BELFOR identifies communications between Williams and Engle, BELFOR fails to identify at what point Debtor had an obligation to speak.[17] *See Marietta College v. Valiante,* No. 13CA12, 2013 WL 6535304, at *4-5, 2013 Ohio App. LEXIS 5645, at *10-13 (Ohio Ct. App. Nov. 25, 2013)(providing that estoppel may apply, not only due to a party's words or acts, but also by his silence when there is an obligation to speak). Further, Debtor presented evidence that it did not remain silent; rather, Williams indicted that direct payments by Travelers to BELFOR were not approved by the insured. *See* Exhibit J. As reasonable minds could differ regarding when Debtor may have had a duty to speak, resolution is not appropriate on summary judgment.

---

[17] To the extent BELFOR relies upon communications between Engle and Williams set forth in its Concise Statement of Material Facts, it is unclear how discussions between Williams and Engle are construed as misleading misrepresentations to BELFOR. *See* Doc. No. 24 at ¶¶34-40.

17

BELFOR expands on its argument regarding estoppel in a footnote in its Reply. *See* Doc. No. 60 at 5 n.4. BELFOR contends, for example, that the act of depositing the insurance proceeds could be an implied act of assurance to BELFOR that the amount would not be challenged. Though BELFOR cites to the standard for estoppel by acquiescence, BELFOR fails to complete the citation:

> Acquiescence "requires a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his ... rights against the defendants." **In addition, the party to be estopped "must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended."**

*See Nat'l Football League v. Rondor, Inc.,* 840 F. Supp. 1160, 1167 (N.D. Ohio 1993) (emphasis added; internal citations omitted).[18] Here, however, BELFOR was not paid, and BELFOR was advised of the position of Moonbeam and Debtor that the entities would not agree to direct payment by Travelers to BELFOR. Further, Debtor contends that it was not previously aware of the alleged inflated charges. As such, Debtor could not acquiesce in conduct of which it was not aware. *See Rondor*, 840 F. Supp. at 1167. As all justifiable inferences are to be drawn in favor of the non-moving party, the acceptance of funds from Travelers fails to establish as a matter of law that BELFOR was assured of an agreement regarding the amount of its claim.

Further, to the extent BELFOR asserts it relied upon Debtor's conduct in reducing its lien to the amount of $2.8 million, no evidence was provided by BELFOR to support the reason for the reduction. Specifically, no evidence was offered to support a finding that the mere acceptance by

---

[18] Likewise, to the extent BELFOR relies upon *Zwerin v. 533 Short North LLC*, that analysis also provides that "[t]he act must clearly and unequivocally import the actor's purpose to sleep upon his rights, and not to assert them." *See Zwerin v. 533 Short North, LLC*, No. 2:10-cv-488, 2012 WL 5388762, at *2, 2012 U.S.Dist LEXIS 157745, at *5 (S.D. Ohio Nov. 2, 2012)(quoting *Zivich v. Mentor Soccer Club, Inc.*, No. 95-L-184, 1997 WL 203646, at *12 , 1997 Ohio App. LEXIS 1577, at *39 (Ohio Ct. App. Apr. 18, 1997)).

Moonbeam of the funds from Travelers induced detrimental action by BELFOR.[19] Further, *even if*, BELFOR reduced its lien in reliance on the conduct of Debtor and/or Moonbeam there is a question regarding whether such reliance was *reasonable*.[20] Therefore, the Court cannot find that Debtor is estopped as a matter of law from challenging the value of BELFOR's services.

BELFOR also contends that Debtor is estopped from challenging the performance and quality of its work. In support of an affirmative representation to this effect, BELFOR cites to the Certificate of Satisfaction. As previously addressed, this document was signed by Osborne, whose authority to bind Debtor has not been established. Therefore, whether the statement within the document can be considered as a representation by Debtor cannot be determined on this record and cannot establish estoppel at this juncture.

Similar to BELFOR's argument regarding waiver, BELFOR contends that Debtor should be estopped from challenging the quality of BELFOR's work as Debtor failed to raise these challenges in the form of a counterclaim in the State Court Action. BELFOR argues that the assertion of the affirmative defense of setoff in the State Court Action is insufficient. *See* Doc. No. 60 at 5.[21] Upon review of the First Amended Answer filed in the State Court Action, it cannot be interpreted as any kind of assurance that Debtor would not assert its rights regarding the quality of BELFOR's work. *See* Exhibit AA. In fact, the First Amended Answer clearly challenges the

---

[19] In addition to BELFOR's failure to produce evidence in support of this allegation, Debtor produced evidence in support of its contention that BELFOR's initial invoice failed to reflect the correct rates resulting in a reduction. *See* Exhibit E at 108:12-109:15.

[20] One could certainly question the reasonableness of BELFOR's decision to reduce its lien in January 2020 based solely on representations by Travelers and payment to Moonbeam when months earlier BELFOR was advised that it would have to resolve the issue of payment directly with the insured.

[21] Although BELFOR contends that the defense was deficient and improperly stated, this Court is unaware of any action taken by BELFOR in State Court to strike or otherwise challenge the affirmative defense. Nor is it clear that the Debtor would have been denied the opportunity to amend in the face of a challenge. However, less significant for the purpose of BELFOR's argument is the *form* in which Debtor challenged the quality of the work; rather, the key appears to be that Debtor *did* raise challenges to the quality of the work.

quality of the work under the heading "First Defense." *See* Exhibit AA at ¶10. Construing the evidence in the light most favorable to Debtor as the non-moving party, BELFOR failed to establish any representation that Debtor would not challenge the quality of BELFOR's work.

Finally, implicit in the application of estoppel is the prevention of fraud with a purpose of promoting justice. *See Marietta College*, 2013 WL 6535304, at *5, 2013 Ohio App. LEXIS 5645, at *12. Therefore, as Debtor has raised allegations of fraudulent overbilling, to the extent proven true, application of estoppel would serve to permit fraud rather than prohibit it. Each party portrays itself as the innocent victim of the opposing party's dishonest and fraudulent conduct. Amidst the accusations being leveled in both directions and with the need for additional discovery, the outcome of this case will likely be determined at trial, at which time the Court can assess the full record and the credibility of the witnesses.

## Conclusion

Based on the foregoing, BELFOR failed to establish that it is entitled to judgment as a matter of law regarding the alleged minimum amount of its claim. Accordingly, the Motion must be denied. An Order will be entered consistent with this Memorandum Opinion.

Date: November 19, 2021      /s/ Carlota M. Böhm
                             Carlota M. Böhm
                             Chief United States Bankruptcy Judge

**MAIL TO:**

Office of the United States Trustee
Michael Frank Jacobson, Esq.
Kerri Coriston Sturm, Esq.
Helen S. Ward, Esq.
Ann Marie Uetz, Esq.

FILED
11/19/21 2:11 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA